IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-590-D

WILLIAM JEFFREY COOPER, )
)
Plaintiff, )
)
v. ) **ORDER**
)
FIRST-CITIZENS BANK & TRUST )
COMPANY, )
)
Defendant. )

On November 6, 2020, William Jeffrey Cooper ("Cooper" or "plaintiff") filed a complaint against First-Citizens Bank & Trust Company ("First-Citizens" or "defendant") [D.E. 1]. Cooper alleges discrimination and retaliation under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), and interference and retaliation under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq. ("FMLA"). See id. ¶¶ 32–59. On October 15, 2021, First-Citizens moved for summary judgment [D.E. 15], and filed a memorandum in support [D.E. 16] and a statement of material facts [D.E. 17]. On November 19, 2021, Cooper responded in opposition [D.E. 19, 20]. On December 3, 2021, First-Citizens replied [D.E. 21, 22]. As explained below, Cooper twice fell asleep on the job, including on the same day that he was disciplined for poor performance. First-Citizens did not violate the ADA or FMLA in terminating Cooper's employment. Thus, the court grants First-Citizens's motion for summary judgment.

I.

Cooper was a "Computer Operations Technician I" at First-Citizens. See Def.'s Stmt. Mat. Facts ("SMF") [D.E. 17] ¶ 1; Pl.'s Resp. to Stmt. Mat. Facts ("Resp. to SMF") [D.E. 20] ¶ 1. Computer operations technicians monitor First-Citizens's systems to ensure there are no errors or other alerts that could disrupt bank operations. See SMF ¶¶ 2, 4; Resp. to SMF ¶¶ 2, 4. First-

Citizens employs computer operations technicians to monitor its systems 24 hours a day, seven days a week to ensure the bank's computer operations systems are always operational. See SMF ¶ 2; Resp. to SMF ¶ 2. Cooper worked the overnight shift and received a 12% premium. See SMF ¶ 3; Resp. to SMF ¶ 3.

In mid-September 2019, Cooper injured his leg at home when he tripped over his dog's water bowl. See SMF ¶ 11; Resp. to SMF ¶ 11. On September 18, 2019, Cooper reported his injury to his supervisor, Ron Gegax ("Gegax"). See SMF ¶ 12; Resp. to SMF ¶ 12. That night, in light of Cooper's injury, Gegax allowed Cooper to work from home. See SMF ¶ 13; Resp. to SMF ¶ 13. That night, while on duty, Cooper did not respond to Gegax's attempts to contact him and later explained that he had fallen asleep because of medication he had taken. See SMF ¶ 14; Resp. to SMF ¶ 14. Gegax told Cooper that he would not be able to work from home if he could not stay awake. See SMF ¶ 14; Resp. to SMF ¶ 14. Gegax discussed Cooper's somnolence with First-Citizens's human resources department ("HR") and reported the issue to his superiors, Paulette Sheville, IT Command Center Manager, and Greg Edmundson, Director of IT Environment Management and Quality Assurance. See SMF ¶ 15; Resp. to SMF ¶ 15. Because of Cooper's disciplinary history and based on the severity of the misconduct, Edmundson considered terminating Cooper's employment. See Edmundson Aff. [D.E. 17-2] ¶ 5. After reviewing Cooper's disciplinary history and consulting with HR, Edmundson decided to proceed with written discipline rather than termination. See SMF ¶¶ 16–17; Resp. to SMF ¶¶ 16–17.

On October 2, 2019, Cooper failed to report for his scheduled shift. See SMF ¶ 18; Resp. to SMF ¶ 18. Cooper's team lead performed a wellness check. See SMF ¶ 18; Resp. to SMF ¶ 18. Cooper told Gegax he could not work because his knee hurt. See SMF ¶ 18; Resp. to SMF ¶ 18. The next day, Cooper informed Gegax that he intended to request a leave of absence for his leg injury. See SMF ¶ 19; Resp. to SMF ¶ 19. At the time, First-Citizens had not finalized the written discipline for sleeping on the job and delivered it to Cooper. See SMF ¶ 20; Resp. to SMF ¶ 20.

2

Due to First-Citizens's standard practice of not pursuing disciplinary action against employees while they are on leave, HR and Edmundson put the disciplinary action on hold until First-Citizens resolved Cooper's leave request. See SMF ¶ 20; Edmundson Aff. [D.E. 17-2] ¶ 6; Resp. to SMF ¶ 20. On October 8, 2019, First-Citizens denied Cooper's leave request because his healthcare provider stated that Cooper could perform his job functions and did not require leave for his leg. See SMF ¶ 21; Resp. to SMF ¶ 21.

On October 8, 2019, Cooper returned to work. See SMF ¶ 23; Resp. to SMF ¶ 23. That night, Cooper's coworkers complained to Gegax that Cooper disrupted their ability to concentrate by complaining about his doctors and other personal matters. See SMF ¶ 24; Resp. to SMF ¶ 24. Gegax asked the complaining coworkers to make formal statements about their complaints so that he could accurately report the incident to Edmundson and HR. See Resp. to SMF at 7; [D.E. 22] 2–3. Because of the disruption, Gegax sent Cooper home midshift and immediately informed Edmundson of the incident. See SMF ¶ 24; Resp. to SMF ¶ 24.

On October 9, 2019, Gegax discovered that Cooper had recorded a full 12-hour shift for September 18, 2019, the night Cooper had fallen asleep while working from home. See SMF ¶ 25; Resp. to SMF ¶ 25. Gegax informed Edmundson about Cooper misreporting his time, and Edmundson reported the incident to an HR representative. See SMF ¶¶ 25, 27; Resp. to SMF ¶¶ 25, 27. At that point, Edmundson decided to proceed with disciplining Cooper. See Edmundson Aff. [D.E. 17-2] ¶ 8. An HR representative prepared a written disciplinary warning for Cooper addressing his inaccurate timekeeping and "general unprofessional behavior in the workplace." Edmundson Aff. [D.E. 17-2] ¶ 8; see SMF ¶ 27; Resp. to SMF ¶ 27. On October 11, 2019, at the beginning of Cooper's next shift, Gegax delivered the written disciplinary warning to Cooper. See SMF ¶ 27; Resp. to SMF ¶ 27. The warning advised Cooper that he would have to "improve his performance in certain specified areas in order to continue his employment with the Bank, including: (a) record time worked appropriately for [the shift when he fell asleep]; (b) notify his supervisor if

3

he is unable to complete his shift; and (c) exhibit professional behavior in the workplace." SMF ¶ 30; see Written Warning [D.E. 17-7] 2–3; Resp. to SMF ¶ 30. The warning also stated that if Cooper did "not meet these objectives" or "violate[d] any other Bank policy, standard, or procedure," he would "be subject to further disciplinary action up to and including immediate termination." Written Warning [D.E. 17-7] 2. Cooper signed the written warning. See id. at 3. A few hours after Gegax delivered the warning, Cooper's shift lead notified Gegax that Cooper was sleeping at his workstation. See SMF ¶ 32; Resp. to SMF ¶ 32. Gegax immediately called Cooper and woke him. See SMF ¶ 32; Resp. to SMF ¶ 32. At 4:27 AM on October 12, 2019, Gegax informed Edmundson of the incident. See SMF ¶ 36; Resp. to SMF ¶ 36. Upon Edmundson's request, Gegax summarized the incident in an email to Edmundson. See SMF ¶¶ 36–37; Resp. to SMF ¶¶ 36–37. On the morning of October 12, 2019, Edmundson forwarded Gegax's email to two HR representatives. See SMF ¶ 37; Resp. to SMF ¶ 37. After learning about this incident, which occurred after Cooper had received the written warning, Edmundson decided to pursue discharging Cooper. See SMF ¶ 38; Edmundson Aff. [D.E. 17-2] ¶ 12; Wright Aff. [D.E. 17-5] ¶¶ 6–7; Resp. to SMF ¶ 38. Edmundson and HR representatives discussed Cooper's termination on Saturday, October 12, 2019, and Monday, October 14, 2019. See SMF ¶¶ 38–41; Edmundson Aff. [D.E. 17-2] ¶ 12; Wright Aff. [D.E. 17-5] ¶¶ 6–7.

First-Citizens had scheduled Cooper to work the nights of October 12 and 13; however, Cooper requested leave for those evenings. See SMF ¶ 43; Resp. to SMF ¶ 43. After consulting HR, Gegax approved Cooper's leave. See SMF ¶ 43; Resp. to SMF ¶ 43. Cooper told Gegax that he wanted the leave to seek medical attention but did not elaborate. See SMF ¶ 43; Resp. to SMF ¶ 43. In the afternoon of October 12, 2019, Edmundson learned that Cooper would not be working the nights of October 12 and 13. See SMF ¶ 44; Edmundson Aff. [D.E. 17-2] ¶ 11; Resp. to SMF ¶ 44. On October 14, 2019, Edmundson (in consultation with HR) decided to terminate Cooper's employment. See SMF ¶ 41; Edmundson Aff. [D.E. 17-2] ¶ 12; Wright Aff. [D.E. 17-5] ¶¶ 6–7.

4

Cooper's next scheduled shift was October 16, 2019, and Edmundson and HR planned to inform Cooper about his employment termination at that time. See SMF ¶ 41; Edmundson Aff. [D.E. 17-2] ¶ 12; Wright Aff. [D.E. 17-5] ¶¶ 6–7.

On October 15, 2019, after meeting with his medical provider on October 14, Cooper requested a leave of absence. See SMF ¶ 45; Resp. to SMF ¶ 45. First-Citizens initially granted Cooper a one-month leave of absence through mid-November 2019, which the bank extended multiple times at Cooper's request. See SMF ¶ 48; Resp. to SMF ¶ 48. After learning on October 15 that Cooper had requested a leave of absence, Edmundson and HR decided to delay terminating Cooper's employment until Cooper returned from leave because of First-Citizen's standard practice of not taking employment action during a leave of absence. See SMF ¶¶ 46–47; Resp. to SMF ¶¶ 46–47. During Cooper's leave, a doctor diagnosed Cooper with sleep apnea. See SMF ¶ 50; Resp. to SMF ¶ 50. Cooper never reported his sleep apnea diagnosis to First-Citizens. See SMF ¶ 50; Resp. to SMF ¶ 50. Cooper also had never reported any sleep problems to First-Citizens, despite believing that he may have been suffering from sleep apnea for years before receiving this initial diagnosis. See SMF ¶ 50; Resp. to SMF ¶ 50; Cooper Dep. [D.E. 19-1] 26.

Around January 12, 2020, Cooper was released to return to work. See SMF ¶ 51; Resp. to SMF ¶ 51. At that time, Edmundson resumed Cooper's termination, informed HR and Gegax of the decision, and instructed Gegax to terminate Cooper's employment. See SMF ¶ 51; Edmundson Aff. [D.E. 17-2] ¶ 15; Wright Aff. [D.E. 17-5] ¶ 10; Resp. to SMF ¶ 51. On January 14, 2020, before he returned to work, First-Citizens terminated Cooper's employment. See Resp. to SMF at 7.

On February 25, 2020, Cooper filed a charge with the Equal Employment Opportunity Commission ("EEOC"). See Compl. ¶ 9. On August 27, 2020, the EEOC issued Cooper a Dismissal and Notice of Rights. See id. ¶ 11. On November 6, 2020, Cooper filed this suit alleging that First-Citizens terminated his employment in violation of the ADA and the FMLA.

5

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence" is insufficient; "there must be evidence on which the [factfinder] could reasonably find for the" nonmoving party. Id. at 252.

In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott, 550 U.S. at 378, 380. Nevertheless, the court is not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." Anderson, 477 U.S. at 251 (quotation omitted). "[C]onclusory statements, without specific evidentiary support," do not create genuine issues of material fact. Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998). Only factual disputes that affect the outcome of the case properly preclude summary judgment. See Anderson, 477 U.S. at 247–48.

6

III.

A.

Cooper argues that First-Citizens terminated his employment because of his disabilities and thereby violated the ADA. See Compl. ¶¶ 13–39. First-Citizens responds that Cooper has not established a prima facie case of disability discrimination, Cooper was terminated for a legitimate, nondiscriminatory reason, and Cooper lacks evidence that this reason was pretextual. See [D.E. 16] 8–17.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). Cooper proceeds under the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Raytheon Co. v. Hernandez, 540 U.S. 44, 49 & n.3 (2003).[1] To establish a prima facie case for his ADA claim, Cooper must demonstrate that (1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling First-Citizens's legitimate expectations at the time of his discharge; and (4) the circumstances of his discharge raise a reasonable inference of disability discrimination. See Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012); Rohan v. Networks Presentations LLC, 375 F.3d 266, 272 n.9 (4th Cir. 2004); Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001).

If Cooper proves his prima facie case, the burden shifts to First-Citizens to articulate a legitimate, nondiscriminatory reason for Cooper's discharge. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–09 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254

---

[1] Cooper argues that Gegax's statement that an employee missing work for a week is a "problem" is direct evidence of discriminatory animus or evidence of pretext. See [D.E. 19] 7. Gegax's statement, however, referenced unscheduled absences, not pre-approved medical leave. See Gegax Dep. [D.E. 19-3] 11. Moreover, and in any event, although Gegax was Cooper's immediate supervisor, he was not the decisionmaker for Cooper's discharge. See SMF ¶¶ 37–38; Edmundson Aff. [D.E. 17-2] ¶ 12; Wright Aff. [D.E. 17-5] ¶¶ 6–7; Resp. to SMF ¶¶ 37–38.

7

(1981); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–80 (2009). "This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quotation omitted); see St. Mary's Honor Ctr., 509 U.S. at 509. If First-Citizens articulates a legitimate, nondiscriminatory reason for Cooper's discharge, Cooper must demonstrate a genuine issue of material fact that First-Citizens's reason was a mere pretext for disability discrimination. See, e.g., Reeves, 530 U.S. at 143; Burdine, 450 U.S. at 252–56; Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006); Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 514 (4th Cir. 2006), abrogated in part on other grounds by Gross, 557 U.S. at 177–80; Rowe v. Marley Co., 233 F.3d 825, 829 (4th Cir. 2000).

Cooper has not demonstrated a prima facie case of disability discrimination. First, Cooper is not a "qualified individual" with a disability. See Cook v. United Parcel Serv., Inc., No. 21-1693, 2022 WL 1090251, at *1 (4th Cir. Apr. 12, 2022) (per curiam) (unpublished) ("[T]o establish a cognizable ADA claim—whether based on failure to accommodate or wrongful termination—the plaintiff must establish that he was a 'qualified individual with a disability.'"). A "qualified individual" is one who "can perform the essential functions of the employment position they hold or desire, either with or without reasonable accommodation." Wirtes v. City of Newport News, 996 F.3d 234, 238 (4th Cir. 2021) (cleaned up). To determine whether a plaintiff satisfies this requirement, the court must consider: "(1) whether [Cooper] could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue, and (2) if not, whether any reasonable accommodation by the employer would enable [him] to perform those functions." Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir. 1994) (cleaned up); see Cook, 2022 WL 1090251, at *1; Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 462 (4th Cir. 2012). "A job function is essential when 'the reason the position exists is to perform that function,' when there aren't enough employees available to perform the function, or when the

8

function is so specialized that someone is hired specifically because of his or her expertise in performing that function." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 579 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.2(n)(2)); see Cook, 2022 WL 1090251, at *1; see also Harris v. Reston Hosp. Ctr., LLC, 523 F. App'x 938, 947 (4th Cir. 2013) (per curiam) (unpublished); Rohan, 375 F.3d at 279 ("A job function is essential if it bears more than a marginal relationship to the job at issue." (cleaned up)). "An ADA plaintiff bears the burden of demonstrating that he is a 'qualified individual.'" Jessup v. Barnes Grp., Inc., 23 F.4th 360, 365 (4th Cir. 2022); Halpern, 669 F.3d at 462. Staying awake, alert, and attentive are essential functions of the computer operations technician position. See SMF ¶¶ 4–5 ("Plaintiff's primary responsibility as a Computer Operations Technician I was to monitor the Bank's computer operations systems to ensure that there were no errors or other alerts that could disrupt operations of the Bank," and "Plaintiff's job required him to monitor 'a lot of information' and act as a 'watch dog' for the Bank."); Resp. to SMF ¶¶ 4–5.

When Cooper twice fell asleep on the job, he was not able to perform the essential functions of his job, with or without a reasonable accommodation. See Clark v. Champion Nat'l Sec., Inc., 952 F.3d 570, 582–84 (5th Cir.), cert. denied sub nom. Clark v. Inco Champion Nat'l Sec., Inc., 141 S. Ct. 662 (2020); Smith v. Sturgill, 516 F. App'x 775, 776–77 (11th Cir. 2013) (per curiam) (unpublished); cf. Works v. Berryhill, 686 F. App'x 192, 196–97 (4th Cir. 2017) (per curiam) (unpublished); Harris, 523 F. App'x at 947. Like the plaintiff in Clark, Cooper never requested any accommodations concerning his inability to stay awake and does not cite any accommodations that would have allowed him to fulfill his job requirements. See 952 F.3d at 584. In fact, while employed, Cooper never informed First-Citizens that he had sleep apnea or struggled with sleep. See SMF ¶ 50; Resp. to SMF ¶ 50; Cooper Dep. [D.E. 19-1] 26.

Second, Cooper was not meeting First-Citizen's legitimate expectations at the time of his discharge. "[T]he prima facie case requires the employee to demonstrate that he was 'qualified' in the sense that he was doing his job well enough to rule out the possibility that he was fired for

9

inadequate job performance, absolute or relative." Warch, 435 F.3d at 514–15 (cleaned up). An employer can show the employee was not meeting its "legitimate expectations where the employer had previously reprimanded the plaintiff based on concrete, specific observations, and the plaintiff continued to perform contrary to those expectations." McZeke v. Horry Cnty., 609 F. App'x 140, 144 (4th Cir. 2015) (unpublished) (citations and quotations omitted). First-Citizens relies on computer technicians to constantly maintain an awareness of its systems and to address problems as they arise, by either fixing the problems or forwarding the problems to the proper level for resolution. See Cooper Dep. [D.E. 19-1] 5–10. Being awake and alert is a legitimate expectation for Cooper's position. See SMF ¶¶ 2–3; Resp. to SMF ¶¶ 2–3; cf. Cooper Dep. [D.E. 19-1] 5–10. Indeed, Cooper does not contend that First-Citizens's expectation that computer technicians remain awake and alert while on the job is illegitimate. See Cooper Dep. [D.E. 19-1] 10. Cooper, however, twice fell asleep on the job, including on the night he was disciplined for poor performance. By repeatedly failing to stay awake and alert on the job, Cooper failed to meet First-Citizens's legitimate expectations.

In opposition, Cooper offers his work history with First-Citizens and notes that he did not believe his job was at risk. See [D.E. 19] 5–6. Cooper's work history, however, does not create a genuine issue of material fact concerning whether he was meeting First-Citizens's legitimate expectations at the time of his discharge. See Lloyd v. New Hanover Reg'l Med. Ctr., No. 7:06-CV-130-D, 2009 WL 890470, at *9 (E.D.N.C. Mar. 31, 2009) (unpublished) (collecting cases), aff'd, 405 F. App'x 703 (4th Cir. 2010) (per curiam) (unpublished). Likewise, Cooper's ignorance about whether his performance placed his job at risk does not create a genuine issue of material fact. Moreover, although Cooper claims that he "was never given the impression that his job was at risk" due to his misconduct and disciplinary history, he does not address how he was meeting First-Citizens's legitimate expectations at the time of his discharge in light of twice sleeping on the job, an unscheduled absence, disruptive behavior, and inaccurate time reporting. Compare [D.E. 19] 5–6,

10

with SMF ¶¶ 14, 18, 24, 25, 32, and Resp. to SMF ¶¶ 14, 18, 24, 25, 32. Even viewing the record in the light most favorable to Cooper, Cooper has not created a genuine issue of material fact concerning whether he was meetings First-Citizens's legitimate expectations at the time of his discharge. He was not. Therefore, Cooper has failed to satisfy the second element of his prima facie case.

Alternatively, even if Cooper had established his prima facie case, First-Citizens, in turn, has met its burden of production and articulated a legitimate, nondiscriminatory reason for Cooper's termination: poor performance. See, e.g., St. Mary's Honor Ctr., 509 U.S. at 506–09; Burdine, 450 U.S. at 254–56. An employer lawfully can rely on poor performance in taking an adverse employment action. See Laing v. Fed. Express Corp., 703 F.3d 713, 722 (4th Cir. 2013); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 332–33 (E.D.N.C.), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished); Iskander v. Dep't of Navy, 116 F. Supp. 3d 669, 678–79 (E.D.N.C.), aff'd, 625 F. App'x 211 (4th Cir. 2015) (per curiam) (unpublished); Fisher v. Asheville-Buncombe Tech. Cmty. Coll., 857 F. Supp. 465, 469–70 (W.D.N.C. 1993), aff'd, 25 F.3d 1039, 1994 WL 233413 (4th Cir. 1994) (per curiam) (unpublished table decision); see also Clark, 952 F.3d at 583 n.49. "[S]leeping on the job hardly needs defending as a basis for termination. In various contexts, courts have repeatedly approved of ADA-challenged discharges for falling asleep at work, particularly in safety-sensitive positions." Brewington v. Getrag Corp., No. 5:09CV31-V, 2011 WL 4829399, at *6 (W.D.N.C. Oct. 12, 2011) (quotation and citation omitted); see Leonberger v. Martin Marietta Materials, Inc., 231 F.3d 396, 397, 399 (7th Cir. 2000) (sleeping on the job is a legitimate nondiscriminatory reason for discharging an employee, even for an employee with sleep apnea).[2] First-Citizens provided a legitimate, nondiscriminatory reason for Cooper's discharge—

---

[2] Cooper and First-Citizens dispute whether Cooper's sleeping on the job was related to his medical conditions, see, e.g., SMF at ¶¶ 14, 34; Resp. to SMF ¶¶ 14, 34, and Cooper's testimony on the issue is inconsistent. Compare Cooper Dep. [D.E. 19-1] 30 (testifying that "falling asleep was not medically induced"), with id. at 24, and Resp. to SMF ¶ 34. But the law does not require an

11

namely, poor performance (including twice falling asleep on the job). See [D.E. 15] 16; SMF ¶ 38; Edmundson Aff. [D.E. 17-2] ¶ 12; Wright Aff. [D.E. 17-5] ¶¶ 6–7; Resp. to SMF ¶ 37. Thus, the burden shifts to Cooper to demonstrate a genuine issue of material fact about pretext. See, e.g., Reeves, 530 U.S. at 143–49; Burdine, 450 U.S. at 253; Hux, 451 F.3d at 315; Hill, 354 F.3d at 298.

A plaintiff can demonstrate pretext by showing that the defendant's proffered "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [disability] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quoting Burdine, 450 U.S. at 256), abrogated in part on other grounds by Gross, 557 U.S. at 177–80. "[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 652 (4th Cir. 2021) (quotation omitted; alteration in original); see Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019). "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." Hux, 451 F.3d at 315; see Anderson v. Discovery Commc'ns, LLC, 517 F. App'x 190, 196–97 (4th Cir. 2013) (per curiam) (unpublished).

Even viewing the evidence in the light most favorable to Cooper, no rational jury could find that First-Citizens's explanation was a pretext for disability discrimination. Cooper had a

---

employer to ignore misconduct that has occurred "because the [employee] subsequently asserts it was the result of a disability." Halpern, 669 F.3d at 465. Regardless of whether Cooper's somnolence was connected to his sleep apnea, falling asleep on the job, especially a job at which attentiveness was a primary responsibility, is a valid reason for discharging Cooper. See, e.g., Vannoy v. Fed. Rsrv. Bank of Richmond, 827 F.3d 296, 305 (4th Cir. 2016) ("[T]he ADA does not require an employer to simply ignore an employee's blatant and persistent misconduct, even where that behavior is potentially tied to a medical condition."); Jones v. Am. Postal Workers Union, 192 F.3d 417, 429 (4th Cir. 1999) (same); Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n.3 (4th Cir. 1997) ("Misconduct—even misconduct related to a disability—is not itself a disability, and an employer is free to fire an employee on that basis.").

12

documented record of poor performance that comports with First-Citizens's proffered explanation. Moreover, Cooper has not shown any inconsistency in the accounts from Edmundson and the HR representatives about the termination decision. See Jacobs, 780 F.3d at 574–75; Anderson, 517 F. App'x at 196–97; Howard, 262 F. Supp. 3d at 333. Cooper's lone evidence of "animus" is Gegax's out-of-context statement about unscheduled absences, but Edmundson in consultation with HR (not Gegax) made the discharge decision. See [D.E. 19] 7; [D.E. 22] 3–4. Cooper also cites Wright v. Stark Truss Co., No. 2:10-cv-2427-RMG, 2012 WL 3039092 (D.S.C. July 24, 2012) (unpublished), but Wright does not help Cooper. Unlike the defendant in Wright, Cooper has not cited any supervisory expressions of frustration about Cooper's medical leave or requests for medical leave. Cooper's direct supervisor, Gegax, understandably stated that unscheduled absences could create staffing problems. See [D.E. 19] 7; [D.E. 22] 3–4. However, neither Gegax nor the decisionmaker ever expressed any frustration or negativity toward Cooper's medical leave or medical leave requests.

Cooper disputes that First-Citizens made the discharge decision on October 12 and 14, 2019, and notes that (1) there is no written record that First-Citizens made the decision then and (2) Gegax was not informed of the decision on those dates. See Resp. to SMF ¶¶ 38–41. Cooper, however, has not provided any evidence to dispute Edmundson and HR representative Wright's sworn statements in their affidavits. See Edmundson Aff. [D.E. 17-2] ¶¶ 11–12; Wright Aff. [D.E. 17-5] ¶¶ 6–7. Likewise, Cooper has not provided any evidence that First-Citizens made the discharge decision at a later date. Cooper responds that First-Citizens could not have made the discharge decision in October 2019 because Gegax did not know about the decision until the end of Cooper's leave in January 2020. Gegax, however, learned that First-Citizens was pursuing Cooper's discharge shortly after Cooper again fell asleep on the job. See Gegax Dep. [D.E. 19-3] 9. Moreover, and in any event, Gegax did not make the discharge decision. See id. Cooper's refrain that Edmundson and HR do not have a written record of their October 2019 termination decision and

13

Cooper's focus on Gegax not being certain of the termination decision until later do not create a genuine issue of material fact. Finally, that First-Citizens waited until after Cooper's leave ended in January 2020 to implement the October 2019 decision does not evince pretext. See, e.g., Fry v. Rand Constr. Corp., 964 F.3d 239, 248 (4th Cir. 2020), cert. denied, 141 S. Ct. 2595 (2021). Thus, the court grants First-Citizens's motion for summary judgment on Cooper's ADA discrimination claim.

B.

Cooper alleges that First-Citizens terminated his employment in retaliation for requesting and taking medical leave and thereby violated the ADA. See Compl. ¶¶ 46–52; [D.E. 19] 8. To establish a prima facie case of ADA retaliation, Cooper "must prove (1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." Reynolds, 701 F.3d at 154; see Rhoads, 257 F.3d at 392. As with Cooper's ADA wrongful termination claim, if Cooper establishes a prima facie case, First-Citizens must articulate a legitimate, nonretaliatory reason for his discharge. See Jacobs, 780 F.3d at 578; Hill, 354 F.3d at 298–99; Rhoads, 257 F.3d at 392. If First-Citizens meets this burden of production, Cooper must show that there is a genuine issue of material fact about pretext. "The plaintiff always bears the ultimate burden of persuading the trier of fact that [he] was the victim of retaliation." Rhoads, 257 F.3d at 392.

Assuming without deciding that Cooper demonstrated a prima facie case of ADA retaliation, First-Citizens had a legitimate, nonretaliatory reason for discharging Cooper: poor performance, including twice falling asleep on the job, with the second incident occurring only hours after Cooper received a formal written warning. See SMF ¶¶ 14–16, 28–29, 32, 38; Edmundson Aff. [D.E. 17-2] ¶¶ 11–12; Wright Aff. [D.E. 17-5] ¶¶ 6–7; Written Warning [D.E. 17-7]; Resp. to SMF ¶¶ 14–16, 28–29, 32, 37–38. Even viewing the record in the light most favorable to Cooper, no rational jury could find that First-Citizens's reason for discharging Cooper was a pretext for retaliation. See, e.g.,

14

Pearlman v. Pritzker, 564 F. App'x 716, 719–20 (4th Cir. 2014) (per curiam) (unpublished); Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 551 (4th Cir. 2006); Hill, 354 F.3d at 298–99. Accordingly, the court grants First-Citizens's motion for summary judgment on Cooper's ADA retaliation claim.

IV.

Cooper alleges interference and retaliation claims under the FMLA. See Compl. ¶¶ 46–59. The FMLA entitles employees to take "reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(2). The FMLA allows eligible employees to take a total of twelve workweeks of leave during any twelve-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). After taking FMLA leave, employees may return to their pre-leave job or an equivalent position. See id. § 2614(a)(1)(A)–(B); see Fry, 964 F.3d at 244. Interference claims stem from section 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1); see Fry, 964 F.3d at 244; Waag v. Sotera Def. Sols., Inc., 857 F.3d 179, 186 (4th Cir. 2017).

The FMLA also protects employees who exercise their rights under the FMLA from retaliation. See 29 U.S.C. § 2615(a)(2) ("It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."). Section 2615(a)(2) encompasses retaliation claims. See Fry, 964 F.3d at 244; Waag, 857 F.3d at 186, 191. "In both contexts, a plaintiff can either (1) produce direct and indirect evidence of retaliatory animus or (2) demonstrate intent by circumstantial evidence, which we evaluate under the framework established for Title VII cases in McDonnell Douglas." Fry, 964 F.3d at 244 (quotations omitted); see Vannoy, 827 F.3d at 304; Laing, 703 F.3d at 717; Yashenko, 446 F.3d at 550–51.

15

First, Cooper alleges that First-Citizens interfered with his FMLA leave by not restoring him to his position after his leave. See Compl. ¶¶ 53–59; [D.E. 19] 11. "To make out an 'interference' claim under the FMLA, an employee must thus demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm." Adams v. Anne Arundel Cnty. Pub. Schs., 789 F.3d 422, 427 (4th Cir. 2015). However, "the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." Yashenko, 446 F.3d at 547; see Fry, 964 F.3d at 248.

Cooper also alleges that First-Citizens retaliated against him in violation of the FMLA. See Compl. ¶¶ 46–52; [D.E. 19] 9–10. To establish a prima facie case of retaliation in violation of the FMLA, Cooper must prove that "(1) [he] engaged in a protected activity; (2) [First-Citizens] took adverse action against [him]; and (3) a causal nexus exists between the protected activity and the adverse action." Laing, 703 F.3d at 720; see Vannoy, 827 F.3d at 304; Yashenko, 446 F.3d at 551. "Under [the burden-shifting] framework, [Cooper] bears the ultimate burden of persuading the court that [he] has been the victim of intentional retaliation. To carry this burden, [Cooper] must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct." Fry, 964 F.3d at 246 (cleaned up). "The FMLA does not prevent an employer from terminating an employee for poor performance, misconduct, or insubordinate behavior." Vannoy, 827 F.3d at 304–05.

Assuming without deciding that Cooper created a prima facie case, First-Citizens articulated a legitimate, nonretaliatory reason for discharging him, and Cooper has not created a genuine issue of material fact about pretext. See SMF ¶¶ 14–16, 28–29, 32, 38; Edmundson Aff. [D.E. 17-2] ¶¶ 11–12; Wright Aff. [D.E. 17-5] ¶¶ 6–7; Written Warning [D.E. 17-7]; Resp. to SMF ¶¶ 14–16, 28–29, 32, 37–38. And First-Citizens was not required to forgo its discharge decision just because Cooper took FMLA leave. See Fry, 964 F.3d at 248; Yashenko, 446 F.3d at 547. Therefore, the

court grants First-Citizens's motion for summary judgment on Cooper's FMLA retaliation and interference claims.

V.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 15]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 14 day of June, 2022.

JAMES C. DEVER III
United States District Judge